## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| John Galdo, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PPL ELECTRIC UTILITIES<br>CORPORATION,<br><br>Defendant. | CIVIL ACTION<br><br>NO. 5:14-CV-05831-JF<br><br>CLASS/COLLECTIVE ACTION<br><br><br><br>*[FILED ELECTRONICALLY]* |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, PPL Electric Utilities Corporation ("PPL"), by and through its counsel, Stevens & Lee, P.C., submits the following Proposed Findings of Fact and Conclusions of Law:

### I. Background Information

1. PPL is headquartered in Allentown, Pennsylvania and employs between 1500 and 1800 employees. (N.T. 265).[1]

2. PPL is an electrical distribution and transmission company providing service to approximately 1.4 million customers throughout eastern and northeastern Pennsylvania with a territory that begins north of Philadelphia and extends to the New York border. (N.T. 264-265).

3. PPL maintains approximately 5,000 miles of transmission lines and another 45,000 miles of distribution lines. (N.T. 265).

4. Most distribution lines are 12,000 volts with some at 23,000 volts and still others at 4,000 volts and cover the area from the distribution substations to the customer's meter. (N.T. 265-266).

---

[1] References herein to N.T. are to the Notes of Testimony from the first day of trial on February 8, 2016. References to Vol. II are to the second day of trial on February 9, 2016. References to "Tenley Tr." are to the trial deposition of Plaintiff Gregory Tenley.

5.  Transmission lines operate at higher voltages, some as high as 500,000 volts but most at 230,000 volts, which includes the bulk system consisting of the lines for which another entity, PJM, is responsible.  PJM (which used to be the Pennsylvania-New Jersey-Maryland interconnection), is an entity that is comprised of several different utilities that includes PPL. PJM is the actual transmission operator with PPL the transmission owner.  Transmission lines provide supply from power plants to transmission substations while lower voltages provide power supply from transmission substations to the distribution substations.  (N.T. 266; N.T. Vol. II, 81-83).

6.  The Windsor Service Center, where the System Operators ("SOs") work, was built to house the Distribution and Transmission operations and is a state of the art control and data center.  It has six (6) pods, with six (6) desks to a pod and three (3) pods devoted to the distribution system.  The Distribution System Operators or "DSOs" sit at desks in the control room with ten (10) monitors and four (4) computer systems to monitor the distribution system. (N.T. 267).

## II.  Hiring of DSOs

7.  In July 2013, Shawn Cappellano-Sarver became Manager of the Distribution Control Center which was then located at the Lehigh Service Center until moving to the new Windsor Service Center facility in February 2014.  (N.T. 266).

8.  From July 2013 through January 2016, Mr. Cappellano-Sarver was responsible for the DSOs who are among the Plaintiffs in this litigation.  (N.T. 267).

9.  PPL attempts to hire DSOs with operator experience who can read diagrams and maps.  PPL seeks out applicants with GIS backgrounds.  (N.T. 316).

10.  Applicants are tested before hire and must pass a PSP-1 general intelligence test followed by an Edison Electrical Institute ("EEI") test of electrical knowledge and then a PSP-2

2

psychological test to evaluate their ability to handle stress.  The PSP-2 test also measures work habits and ethics.  (N.T. 317-19).

11.  Once hired, DSOs are trained by PPL's Training Department.  The training includes both on-the-job training where they are assigned to mentors (and complete a checklist of subject proficiencies) and classroom training.  The DSO training occurs over a six (6) month period before the trainees can qualify as a DSO line system operator and then up to one (1) year before qualifying at distribution substations.  (N.T. Vol. II, 6, Exhibit 11).

12.  As part of their training, DSOs are assigned to a mentor who observes the trainee handling phone communications with field crews, writing permits, and approving switching plans.  After completing the training checklist, the trainee is then scheduled to complete simulations.  (N.T. Vol. II, 7).

13.  PPL uses a simulator set up like a SO desk using the same systems and monitors.  During simulations, the trainee is observed by a shift supervisor and another DSO responding to workplace issues using the Operating Management System ("OMS"), Distribution Management System ("DMS") and Transmission Management System ("TMS") simulating situations that might arise in connection with an unplanned outage.  (N.T. Vol. II, 8-9).

14.  DSO trainees complete two (2) line simulations and two substation simulations as part of their training.  These simulations closely resemble the duties performed by a DSO.  If not successful, a trainee will be coached and then required to complete another simulation. (N.T. Vol. II, 9-10).

15.  Trainees are expected but not required to complete substation training.  Substation training is more complicated because each substation is different with multiple circuit breakers

3

and a more complicated protection scheme.  PPL incentivizes trainees to complete the substation portion of the training by offering a significant monetary benefit.  (N.T. Vol. II, 11-12).

16.  Even employees hired by PPL who had worked in similar positions for other utilities are required to be trained.  Plaintiff, Michael Murphy, a DSO who had worked for another utility before joining PPL, was required to complete classroom training, assigned to a mentor, and required to complete line and substation simulations.  That training, even with eight (8) years of prior relevant experience, occurred over a six (6) to seven (7) month period before Mr. Murphy was scheduled and assigned a shift.  (N.T. 158)

17.  Once qualified, the trainee is scheduled into rotation as a DSO.  The estimated cost to train a DSO is $100,000.  Following training, a DSO receives continuing training four (4) days every seven-week cycle and then also a week of annual high-level training.  (N.T. Vol. II, 13-14).

### III.  The Duties of Distribution System Operators

18.  The goal of the Distribution Department is safety, reliability and production.  Emphasis is placed on safety; both to the public and the work crews.  The DSO must take certain steps to protect employees and the public against injury.  (N.T. 276).

19.  DSOs report to a shift supervisor.  There are seven (7) shift supervisors and each is assigned a team comprised of one (1) senior system operator, three (3) or four (4) DSOs and two (2) dispatchers, who are hourly employees.  The shift supervisors report to Mr. Cappellano-Sarver.  (N.T. 268-269).

20.  When at full capacity, PPL has forty-four (44) DSOs, thirty-five (35) of whom handle day-to-day issues which arise "real time" with nine (9) assigned to short term planning functions ("Planners").  Other than the Planners, DSOs work rotating shifts with a 7-week rotation.  (N.T. 269-270).

4

03/15/2016 SL1 1406932v1 067014.00287

21.  These shifts are imbalanced as most DSOs are assigned to work day shift where there are three (3) teams assigned.  On second and third shifts, there is one team each, as is the case on weekends when DSOs work 12-hour shifts.  More DSOs are assigned to day shift because it is during this shift when most planned "switching" is performed.  This exercise involves PPL field crews performing switching in support of planned maintenance.  (N.T. 270).

22.  Switching refers to the manipulation of a device which is more commonly done from the field.  It involves turning off or on electricity by opening or closing switches.  The switch functions like a light switch although larger and far more complicated.  Some switches are enclosed within vacuum reclosers within a container and when operated an arc is dissipated into a vacuum or an oil container.  (N.T. 272-273).

23.  The switching takes equipment out of service and routinely occurs as a result of damage to equipment (including circuit breakers, voltage regulators or capacitors).  This equipment, when broken and in need of repair, is taken out of service so field crews can safely perform repairs.  (N.T. 273-274).

24.  Switching is not only for repairs, but also for maintenance or to install new equipment done with the intention of not interrupting service to customers.  DSOs perform switching where there is damage to a line to restore customers to service and when repairs are completed they perform additional switching to restore lines back to their normal configurations.
(N.T. 274-275).

25.  In connection with their work, DSOs will prepare the work permits for all unplanned, unscheduled emergency work on distribution lines or at substations listing the switching involved and hanging red tags required as part of OSHA lockout/tagout compliance.  The DSO

will then engage in a formal three-phase communication with field crews, to make certain there are no misunderstandings as to the work to be performed. (N.T. 310, 313).

26. Second and third shift DSOs write and review permits prepared in connection with future scheduled work projects. (N.T. 271).

27. Work permits are written in conjunction with OSHA requirements for using a lockout/tagout system to protect personnel by tagging blocking permits with red tags so field crews do not work on energized lines. (N.T. 292-93).

28. For scheduled work, permits typically begin with a Planner receiving a request to perform work on a distribution line or substation. Planners review the job request and on complicated jobs may go into the field to discuss with field crews (comprised largely of electricians and linemen) the scope of work, different components involved, and to then sequence work in connection with the work permit. (N.T. 294).

29. Work permits once written by the DSO are entered into the DMS system where they will be peer-reviewed by at least three other DSOs before the work is approved. Permits are required for work on all de-energized lines (and because of a recent change to an OSHA regulation, this will soon become all work). (N.T. 295 96).

30. DSOs start each shift with checklists. The shift begins with a review of alarms and any equipment broken or taken out of service. DSOs must make sure that anything put into service that day is properly documented so that other work groups know that the device has been installed. (N.T. 271-272).

31. Public safety concerns arise, by way of example, from low hanging or fallen wires. This would be an example of unplanned or unscheduled work for the DSO, which begins with a call made to PPL and entered into the OMS. A priority is placed on the call and PPL crews must

6

de-energize the hanging or damaged wires as quickly as possible. After receiving notice of the service call, the DSO must investigate, determine location, report whether the line is energized, and then communicate with a field crew or a member of the public (such as a police officer or fireman) to get information with regard to the closest utility pole (each utility pole has a number). DSOs will first attempt to de-energize the downed line so as to minimize disruption to as few customers as possible. (N.T. 278-279).

32. This requires the DSO to engage in investigative work to determine exactly which pole an energized line is coming from. (N.T. 280-281).

33. There are times when a DSO can restore service directly from the Windsor Service Center by using a remote operating device. Some but not all the lines have fault indicators that measure current. If so, DSOs can then look at whether the circuit breaker has discovered a fault and open the device and reclose the circuit breaker to allow customers to be restored to power. (N.T. 285).

34. Since PPL installed a DMS, with the advent of remote operative devices, it is possible for a DSO to handle switching remotely without a field crew. There are approximately 3,000 remote operating devices within the operating system with another anticipated 800 being installed each year. This has actually resulted in more work for the DSO and a corresponding need to hire more DSOs to operate the devices and perform the switching. (N.T. 288-289).

35. A newer system called FISR (Fault Isolation of System Restoration) was introduced in August 2015, but it has only been installed on about 240 circuits and has operated just twice since installation to restore customer service. (N.T. 290).

36. PPL expects DSOs to perform much of their work largely unsupervised. For some time, there were no shift supervisors and presently, there are no shift supervisors on the second,

03/15/2016 SL1 1406932v1 067014.00287

third or weekend shifts.  Shift supervisors can provide guidance or overall supervision, but are not directly involved in switching or taking equipment/lines out of service or existing customers. (N.T. 314, 315).

37.  Plaintiff, William Clair, a former DSO testified that it was not until May 2013 that the Distribution Department scheduled supervisors and until then, if questions were raised, the DSO would call an off-site supervisor to walk through any issues.  (N.T. 130)

38.  Plaintiff, Ricardo Maderas, Jr., a DSO for approximately two (2) years, testified that among the more important responsibilities of a DSO is restoring customer service by executing switching job duties that has been pre-written for planned work or as part of a system upgrade and to complete the appropriate documentation in accordance with that switching.  (N.T. 19).

39.  Mr. Maderas explained that there are a number of Operating Instructions ("OIs") and Standard Operating Procedures ("SOPs") although he was unable to describe the precise number including separate OIs for each substation as well as OIs covering line switching, substation switching, and the reporting of large events for which DSOs need to reference.  (N.T. 24, 25).

40.  Plaintiff Clair explained that these OIs are technical and complex and address circumstances that only someone with appropriate training could interpret and apply and are beyond the comprehension of a layman.  (N.T. 145-46)

41.  Similarly, Plaintiff Michael Murphy testified that in contrast to the SOPs which are primarily administrative, the OIs are "technical" requiring a certain level of technical knowledge and familiarity to understand and read.  (N.T. 165-66)

42.  While there are individual OIs for each substation, there is only one OI (OI-38) that applies to distribution lines even though there are thousands of distribution lines.  Plaintiff

8

Murphy admitted that this one OI applied to each distribution line even though lines have different components.  (N.T. 167-68)

43.  Plaintiff Maderas explained there are safety implications related to not following the OIs.  If a DSO does not follow the OIs, not only will there be concerns with regard to public safety, but there could be other consequences including removing customers from service or even energizing into a fault which may have larger implications for the public.  (N.T. 26, 31).

44.  Plaintiff Maderas testified that DSOs monitor and address problems with regard to the PPL electrical distribution system from their console at Windsor Service Center and regularly communicate with field crews comprised of employees with classifications like linemen, troublemen and substation repairmen.  The employees who comprise the field crew are the employees performing the repairs on energized lines.  (N.T. 36).

45.  Information will be shared between the DSO and field crews according to Plaintiff Maderas to comply with safety protocols as it relates to the energizing and de-energizing equipment and as described in OIs and SOPs.  This information is shared as part of a collaborative process on both energized and de-energized lines in an effort to ensure that service is maintained.  (N.T. 38-39).

46.  Plaintiff Maderas further explained that the DSOs oversee the power system and respond to power outages responding to crews who call in when an outage occurs.  (N.T. 39).

47.  Plaintiff Maderas testified that the DSO often is the first to know there is a power outage by an alarm that rings telling the DSO that a customer or group of customers has lost power.  The DSO is responsible to restore the power, handling it when possible from the console, but in other instances by communicating with the dispatched field crew.  (N.T. 43-46).

03/15/2016 SL1 1406932v1 067014.00287

48. Plaintiff Maderas testified that a DSO is responsible for addressing issues involving downed wires caused by a car hitting a pole or de-energizing a line for a gas leak. (N.T. 54, 55).

49. Plaintiff, George Knebel, a DSO since 2011, explained that the DSO will first attempt to switch remotely, but when unable to do so, field crews will be dispatched. If a switch breaks during switching, the DSO is involved in preparing a new switching plan utilizing their training and experience (with advice from the OIs), making decisions including sequencing the moves, all to restore services that are safe to both PPL field crews and the public. (N.T. 84).

50. Plaintiff Knebel testified that when unexpected situations arise caused by automobile accidents, animals on lines, storms or malfunctions, the DSO receives information and then uses their training and experience to assess, evaluate and respond to these events. (N.T. 84-85).

51. Plaintiff Clair, a former DSO, explained that the DSO must make evaluative decisions such as how the circuit was fed, and what needed to be closed or opened to isolate the area so that a customer would not be dropped. (N.T. 135).

52. Plaintiff Clair explained that these decisions have significance or importance because power to customers rests on DSOs making the right decisions which can, in some instances, be matters of life or death. (N. T. 135)

53. Plaintiff Clair described how he had once made a bad evaluation by reason of a misdiagnosis and misreading implications which caused him to be put on a Performance Improvement Plan. (N.T. 136).

54. By virtue of that bad decision Plaintiff Clair testified that customers were put out of service. (N.T. 137).

55.  Plaintiff Clair testified that because of their training and experience DSOs can determine whether a field crew employee is asking for something that can or cannot be done. (N.T. 139).

**IV.  Job Description for DSOs**

56.  The DSO job description provides that the DSO evaluate and control the status of PPL and substation equipment.  This includes monitoring the status of the system with regard to voltage, power flow, stability and overloads.  The DSO, consistent with the duties included in the job description, physically manipulates switches, gives orders to have switching changed and works with field crews to take voltage regulators and capacitor banks from service. (N.T. Vol. II, 15-16, Exhibit 5).

57.  As reflected within that job description, DSOs are responsible for preparing all three-phase switching and tagging activities in support of maintenance or restorative services.  This relates to the permits written by DSOs or by Planners assigned to the planning function both for restoring service and for routine maintenance or planned outages.  (N.T. Vol. II, 17-18, Exhibit 5).

58.  DSOs prepare and analyze load transfers by shifting loads between lines, considering the protective features of the components to make certain that the load transfer does not melt a line or trip one of the protective devices.  (N.T. Vol. II, 19, Exhibit 5).

59.  DSOs are expected to work without supervision which involves "directing operations" by giving orders to linemen to operate devices and coordinating and directing the testing of these devices, all of which is done utilizing a three-part communication to ensure that orders are effectively communicated.  (N.T. Vol. II, 27, Exhibit 5).

60.  PPL expects DSOs to make independent decisions without a supervisor standing over their shoulder and showing them what to do or how to do it.  DSOs must be able to make

11

decisions because frequently, even during storms, there is not a supervisor available to do anything more than answer questions. As a result, the DSOs need to be able to effectively function without supervision. (N.T. Vol. II, 30-31).

61. The Delegation of Authority Independent Action Letter of August 10, 2012 from David J. Bonenberger, VP, Distribution Operations, provides DSOs with the authority to take actions without seeking permission of Supervision or Management. DSOs have the authority to drop a load or open circuit breakers or whatever is required for public safety and for the stability of the system. For example, if there is a gas leak that requires that circuits in the area be de-energized, this can be accomplished by the DSO without having to stop to ask for permission. (N.T. Vol. II, 31-32, Exhibit 16).

62. Sectionalizing is a procedure used to open devices and restore powers to sections of the line so as to impact the smallest numbers of customers. DSOs have prepared a guideline to help troubleshoot, which is provided to DSOs during training to assist with sectionalizing customer restoration during three-phase outages. (N.T. Vol. II, 34-35, Exhibit 18).

63. Most if not all SOPs are used in connection with documentation by providing direction as to how to write a report and how to report issues to a supervisor in an effort to provide a consistent way of exchanging information to ensure that each DSO is capturing required information in the same way. (N.T. Vol. II, 36-37).

64. Mr. Cappellano-Sarver testified that in his opinion a DSO cannot perform his/her jobs to his expectation without exercising discretion and independent judgment because the vast majority of tasks for which DSOs are responsible require the exercise of discretion and independent judgment including how best to restore service and how to write a permit, which is

complicated because lines are unique and laid out differently based on geography, the number of devices on each line, and the number of tie points. (N.T. Vol. II, 37-38).

65. DSOs accordingly must make evaluative choices with regard to matters of significance including the safety of crews, the reliability and power distribution to customers. (N.T. Vol. II, 39).

66. It is not possible to address every scenario by an OI. Mr. Capellano-Sarver estimates that PPL would need over three thousand different OIs and SOPs to address issues that arise in restoring every single outage. (N.T. Vol. II, 39).

## V. **The Transmission System Operators**

67. Paul Santarelli has been employed by PPL for the past 36 years starting in the Distribution Planning Department and since 2011 has been either the Manager or Senior Manager of Transmission Operations. (N.T. Vol. II, 70-71).

68. Beginning as Manager, and now as the Senior Manager of the Transmission Department, Mr. Santarelli is the highest member of management within the Transmission Operation organization and has four (4) direct reports, including an Operations Planning Manager, an Operations Manager, a Supervising Engineer, and an Engineering Reliability Risk Supervisor. Each Transmission System Operator ("TSO") reports to one of Mr. Santarelli's direct reports (N.T. Vol. II, 72).

69. There are 22 TSO positions at PPL working a 24/7 work schedule. There are no shift supervisors in the Transmission organization. (N.T. Vol. II, 73).

70. The TSOs will often work without any supervision. There are no managers scheduled other than on day shifts between Monday-Friday. (N.T. Vol. II, 73).

71. Included among the TSOs are Planners who review work requests and are not involved in the minute-to-minute "desk operations" as are the other TSOs. There are five (5)

13

Planners assigned to a planning desk who work day shift hours.  Planners volunteer for the

planning position and have the responsibility to write permits and review work requests received

from field employees or sometimes non-PPL personnel requesting that equipment be taken out of

service.  (N.T. Vol. II, 75).

## VI. <u>Training of Transmission System Operators</u>

72.  TSOs, like their DSO counterparts, receive specialized training but the TSO training

is based largely on the preservation of the electric grid and accordingly it is more complex than

on the distribution side.  (N.T. Vol. II, 77).

73.  The training provided to TSOs is to ensure that they can take independent action to

preserve the system.  This is in accordance with an Independent Action Letter which is signed by

the Vice President of Transmission and authorizes TSOs to take independent actions which

include shedding or dumping load to avoid an interruption to customers.  (N.T. Vol. II, 78-79;

Ex. 17).

74.  TSO training includes not only PPL directed training but also training from the North

American Electric Reliability Council ("NERC") who is subject to oversight by the Federal

Energy Regulatory Council ("FERC").  NERC has developed their own training standards for

TSOs which are required for the successful completion of the NERC transmission certification

program.  (N.T. Vol. II, 80-81).

75.  In addition, TSOs receive training provided by PJM.  In addition to their other

training, TSO trainees must pass a PJM transmission certification test after receiving PJM

training in King of Prussia over a period of weeks.  (N.T. Vol. II, 81-83).

76.  The training of a TSO takes at least six (6) months and sometimes as long as one (1)

year, depending upon prior experience and knowledge base.  It requires three (3) simulations to

03/15/2016 SL1 1406932v1 067014.00287

become a TSO. Typically, TSOs are recruited from among DSOs as the TSO position is higher rated and commands higher compensation. (N.T. Vol. II, 83-84).

77. TSOs have a higher job level and are paid more because of their level of knowledge, their training and certification and the complexities and responsibilities associated with their position. TSO training requires certification and knowledge of network analysis, generations, dispatch within transmission and the electrical phenomenon that occurs between generation and transmission as well as increased regulatory compliance. (N.T. Vol. II, 85).

78. Even experienced TSOs are trained by PPL. Plaintiff, Harold Speiss testified that he joined PPL after five and a half years with another utility as a transmission system operator but was still trained by PPL, assigned to a mentor, required to complete simulations and received NERC/FERC training which lasted about six (6) months before assigned in rotation. (N.T. 184).

**VII. The Duties of the Transmission System Operators**

79. TSOs work at higher voltage levels which includes the way that generation interacts with transmission lines. There are also interconnected activities within different companies at these higher voltages. When working at higher voltages, the consequences are far greater as the loss of a transmission line which could result in a loss of power to an entire county or a sector of Pennsylvania. (N.T. Vol. II, 86).

80. Plaintiff, Gregory Tenley, testified that a typical day begins with a shift turnover where the TSO is provided a review of any events or incidents that occurred on the prior shift and continues with reviewing jobs and handling permits and switch orders. (Tenley Tr. 7-8)

81. The duties set forth within the TSO job description accurately represent the primary responsibilities of the TSO and management expects the TSO to perform the enumerated work duties independently without supervision. (N.T. Vol. II, 92-93, Exhibit 19).

15

82.  Plaintiff Spiess testified that on most days a TSO receives information from the outgoing shift, finds out what the system conditions are, what jobs are planned for the day, and receives calls from employees in the field seeking permission regarding issues such as on taking equipment out of service.  The TSO monitors the system waiting for alarms that identify contingency problems that might arise when pieces of equipment "trip out" or would be overloaded or near limits.  (N.T. 175-76).

83.  Plaintiff Tenley testified that the TSO monitors and addresses problems on the transmission system by communicating with field crews and working in conjunction with these field crews relating to both scheduled and emergency repairs to the transmission system. (Tenley Tr. 26-27).

84.  Plaintiff Tenley described that the TSO prepares a step-by-step procedure to switch out pieces of equipment or lines and that the switch order involves relay testing at substations which would not require tagging .There are several different ways to handle that relay testing at substations. (Tenley Tr. 71-72)

85.  Plaintiff Tenley acknowledged there will be typically more than one solution to sectionalizing lines because each line has a different number of switches and the TSO must use their training and experience in conjunction with the OIs to achieve the best solution. (Tenley Tr. 76-77)

86.  Plaintiff Tenley testified that some discretion must be used in coming up with a solution. He explained that the "challenge" was dealing with emergencies which required the TSO to use his training, guidance and policies. (Tenley Tr. 79, 83)

87.  TSOs are provided with high level guidance through the OIs.  The TSO applies this high level guidance but must also apply their own knowledge to unique situations.  The OIs

16

suggest more what to do rather than how to do it, resulting in a myriad of options available to the TSO. (N.T. Vol. II, 93-94).

88.   Consistent with their job descriptions, the TSOs functioning as Planners perform job studies requiring that they review each job to determine whether or not it meets reliability risk criteria.  This includes requests to take equipment out of service, requiring the TSO planner to study the time frame, perform modeling, and determine what adverse consequences may be associated with taking out the piece of equipment.  There are no OIs that assist a TSO with regard to performing these job studies.  There are no SOPs of any kind that relate to the Transmission Department.  (N.T. Vol. II, 95-96).

89.   A job plan prepared by a Planner will be peer reviewed several times by other TSOs to make certain there are no errors or anything that might violate procedures.  According to former TSO, Plaintiff Kenneth Steward, there is usually more than one way to perform a job and the peer review process is intended to come up with the best way in accordance with OIs. (N.T. 112).

90.   Plaintiff Kevin Ehritz, another TSO Planner, testified that the planning work pertains to scheduled repairs and maintenance rather than to the unplanned or emergent work.  The Planner is involved with upgrades, other changes to equipment, and scheduled repairs. Mr. Ehritz estimated that there are about 3,000 jobs processed by Planners each year. (N.T. 221).

91.   Plaintiff Ehritz testified with regard to a complicated or comprehensive project like placing a new substation in service.  He testified that the switching document or permit prepared and then peer reviewed could be a twelve-page document with as many as sixty (60) different switching steps.  (N.T. 223, 225).

17

92. Plaintiff Ehritz explained that a permit prepared by a Planner will be peer reviewed as many as three (3) times by other TSOs. The reason for this level of peer review is because the switching sequence could result in damaging equipment, causing an injury to an individual or inadvertently dumping customers. Because of the severity of the potential consequences, there are "several passes" to ensure that the documents are executed properly and are "flawless". (N.T. 228).

93. According to Plaintiff Ehritz, there are times that changes are made to a permit written by the Planner. These changes can be made by the "real-time operator" (another desk TSO) which will generally be in response to a change to "real-time " conditions which may include consideration of other projects being performed and their overall impact on the electrical grid. The TSO must determine in "real time" whether the sequencing as written on the permit should be implemented consistent with the way it was originally written. (N.T. 230-31).

94. According to Plaintiff Spiess, TSOs are in regular contact with PJM, who may request the TSO to take lines out of service, place equipment back into service, take away load, and respond to emergency conditions. (N.T. 178-79).

95. Consistent with the duties described in their job description, TSOs must direct application of the PPL permit and tag procedures on the bulk power transmission system, preparing the required documentation to promote safety and reliability to the bulk system. That work is done daily without supervision and while there is high level guidance provided within an applicable Operating Instruction (OI 153) that OI provides no detailed step by step analysis. (N.T. Vol. II, 97, Ex. 19).

96. Another primary duty described in the TSO job description and performed by the TSO involves analyzing the transmission system using available tools, including the transmission

18

management system and other external inputs, to quickly recognize abnormalities and take cognitive corrective actions to return the system to normal. This is not for planned work but rather for emergent work caused by an overload or an outage of a transmission line as the result of storms or other extreme weather. (N.T. Vol. II, 98, Ex. 19).

97. There are few remotely controlled transmission lines meaning that most restorations require a callout of field crews comprised of linemen, electricians, or troublemen. This will typically begin by an alarm indicating that the TSO must drop load so the field crew can do switching at the direction of a TSO saving as many customers as possible. (N.T. Vol. II, 99-101).

98. An outage on a transmission line will impact a larger area and the TSO has a monitor that describes which substations are out of power. The TSO must assist in restoring service to customers using the field crews and directing switching. This involves writing permits and doing job studies to ensure that the switching can be accomplished by considering the voltages and making certain not to exceed thermal constraints. (N.T. Vol. II, 103).

99. This requires making a series of evaluative decisions. During an emergency outage there will be different paths to restore customers and the TSO is expected to pick the best course within voltage and thermal guidelines. There are other factors considered including time of day (because most businesses are closed during the evenings) which requires the TSO to determine whether to transfer loads overnight with repairs to follow in the morning hours. (N.T. Vol. II, 104).

100. The last ditch effort available to a TSO as part of the evaluation of the outage involves dumping load. This is done to preserve the system and there are in place Emergency Load Control Procedures codified by PJM which directs TSOs to comply with directives unless

completing the specific direction will violate safety, equipment, regulatory, or statutory requirements or jeopardize the safe, stable operations of the bulk electric system. The directives provided by PJM do not offer a clear step by step directive, meaning that the TSO must research and analyze the situation given their training and experience because the directive only provides what must be done but not how to do it.  (N.T. Vol. II, 105-07, Ex. 2).

101.  Plaintiff Kenneth Steward, a former TSO explained that TSOs are expected to be able to "dump load" to maintain the stability of the electric grid in order to save the system from overloading components or a cascading event, which is something that TSOs are trained to perform.  This is one way to adjust voltages, but is to be used only in emergency situations. When this occurs, the TSO is not working with field crews but performing that work themselves. (N.T. 105-106).

## VIII.  Recent Examples of Evaluative Decisions Made by Transmission System Operators

102.  There have been several recent examples that illustrate how TSOs make evaluative choices on matters of significance in the performance of their job duties.  PPL operates a substation at Berwick which has three 69 kV lines that terminate at that substation.  On the day in question, one (1) line was already out of service for planned work when another of the remaining lines tripped leaving only one line in service.  The TSO, on his own and without supervision or reliance upon OI, immediately ran a job study to determine how much load would need to be shed to bring the voltage into criteria.  After running the job study, the TSO directed a DSO to drop load (a last resort action).  (N.T. Vol II, 108-09).

103.  Recently, there was a transformer fire at the Juniata substation which is a 500 kV-230 kV substation with transformers that convert voltage from high to lower voltages. The field crew reported the transformer fire to a TSO on duty who immediately dropped the 500 kV bus (similar to a wire only with higher ampacity) which he was able to do because of his

20

training and knowledge. Had this not been performed, it could have damaged other equipment or resulted in injuries to work crews. (N.T. Vol II, 109-11).

104. There is a transmission connection between the Holtwood Generating Plant (a hydroelectric plant) and the Face Rock substation which is referred to as the Face Rock 697 Span. On the day in question, Holtwood was testing two (2) new units which had not yet even been modeled at PJM and the TSO monitoring the system received an alarm that the units were generating above the thermal ampacity of the transmission circuit. That TSO independently called PJM requesting that it reduce the units to get them back within thermal ratings. That decision and action was performed without any reliance on an OI and there was no supervisory involvement. (N.T. Vol. II, 111-112).

105. Still another recent example involved an air leak in the mechanism that caused a high voltage circuit breaker at Lock Haven to close, operate, and to then close again sounding an alarm. When repair personnel arrived at the site, they asked the TSO if they could work with the circuit breaker still in service but first needed assurances that there would be no consequences. The TSO ran job studies, determined there were no consequences, and directed the repair personnel to proceed with the work on the energized circuit breakers. That job study required the TSO to simulate tripping the circuit breaker to see what adverse consequences might arise. This work was performed by the TSO based on his job knowledge and training and without any OI to offer direction. It was also performed on a weekend when there was no supervision. (N.T. Vol. II, 113-115).

106. A Department of Defense blimp recently broke from its tether and flew into PPL's service territory with the tether dragging and interrupting service on several high voltage lines. The TSO took independent action to avoid customer interruptions or a blackout prioritizing the

various impacted lines and determining what impact they would have on the generating stations which included the Susquehanna Nuclear Plant. The TSO ran job studies to determine what was causing the issues and as a result of those studies the TSO concentrated repairs on restoring customers on a particular line and then breaking field crews into several teams to restore the other impacted lines. This resulted in a group of customers being transferred from one line to another and the TSO had to restore as many customers as he could from one substation by making the transfers until repairs could be made. There were no OIs that applied and very limited supervision was provided. (N.T. Vol. II, 117-120).

### PROPOSED CONCLUSIONS OF LAW

107. The Court's Memorandum and Order dated February 5, 2016 concluded that the SOs employed by PPL in the Distribution and Transmission department are compensated on a salary basis and at a rate of not less than $455/per week.

108. That Memorandum and Order also concluded that the primary duty of SOs is the performance of office or non-manual work directly related to the management or general business operations of PP&L or PPL customers.

109. Plaintiffs Clair, Ehritz, Spiess, Steward and Tenley are each highly compensated employees within the meaning of 29 C.F.R. § 541.601(a). Their claims under the FLSA are dismissed. (Memorandum and Order dated February 5, 2016)

110. Plaintiffs who work over forty (40) hours in a single workweek are compensated either with straight time pay (1.0x) on their regular rate or in other instances (where the overtime is in response to a storm designated as such by the Pennsylvania Utility Commission) at 1.2 times their regular rate of pay. (Joint Stipulation, ¶ 5).

111. The sole remaining issue is whether the SOs exercise discretion and independent judgment in the performance of their work assignments. The exercise of discretion and

22

independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making decisions after the various possibilities have been considered. 29 C.F.R. § 541.202(a).[2]

112.   The exercise of discretion and independent judgment generally requires independent choice, free from immediate direction or supervision.   29 C.F.R. § 541.202(c).   However, this requirement can be met even where decisions or recommendations are reviewed at a higher level. 29 C.F.R. § 541.202(c).

113.   In making the determination as to whether an employee exercises discretion and independent judgment, all facts should be considered and in particular the following factors: whether the employee has authority to formulate, affect, interpret or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that effects

---

[2] The Complaint was filed as a class/collective action by Plaintiff John Galdo on behalf of himself and similarly situated employees seeking relief under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., and the Pennsylvania Minimum Wage Act, 43 P.S. § 333.110, et seq.   The Complaint stated that Plaintiff's FLSA claim is asserted as a collective action under FLSA § 16(b), 29 U.S.C. § 216(b) while his PMWA claim is asserted as a class action under Federal Rule of Civil Procedure 23.   Pursuant to a Stipulation and Order entered on February 11, 2015, the Court conditionally certified the FLSA collective action and approved the process by which potential opt in plaintiffs would be notified of the action.   Defendant PPL later moved to decertify the conditionally certified class and Plaintiffs filed a Motion in Opposition to the Decertification.   The Court's Memorandum dated February 5, 2016 denied the Motion to Decertify the Conditional Class and certified the class members as a class.

During the course of the trial, Plaintiffs, ignoring the fact that they filed this matter as a collective/class action and opposed the decertification of the class, argued that they did not intend to proceed by way of "representative testimony."   Instead, Plaintiffs asserted they were proceeding on the basis of individual testimony because the class was so small. When the Court questioned about the five (5) individual Plaintiffs who did not testify at all, Plaintiffs' response was, "they have failed to come forward and testify and --and I--   and we're prepared for the ramifications of that." (N.T. Vol. II, page 151).   Accordingly, the suggestion is that rather than consider what DSOs and TSOs do and more specifically whether in the performance of their duties they exercise discretion and independent judgment, that the case be litigated by asking whether each one of the individual Plaintiffs had, as a primary duty during the course of their employment, exercised discretion and independent judgment.   Such an approach ignores that the Plaintiffs filed this on a class or collective action basis and proceeded as such as evidenced by the Stipulation and Order entered in February 11, 2015, Plaintiffs' opposition to class decertification, and the Court's Memorandum dated February 5, 2016. Taken to its logical extreme, Plaintiffs' position could result in some DSOs or TSOs being considered exempt because of their particular exercise of discretion and independent judgment based on work assignments while others being treated as non-exempt.   The evidence presented by PPL in this case is consistent with a class and collective action and relate generally to the duties of DSOs and TSOs rather than each particularized Plaintiff.

23

business operations to a substantial degree…whether the employee has authority to waiver or deviate from established policies and procedures without prior approval…whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long or short term business objectives… and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. 29 C.F.R. § 541.202(b).

114.  The evidence establishes that SOs, both in Distribution and Transmission, are regularly expected and required to interpret or implement management policies and procedures both with regard to planned maintenance and to outages caused by a myriad of unanticipated issues all with the intention of having work performed safely by field crews and in compliance with OSHA standards to have customers being provided uninterrupted service while repairs are being performed or being restored to service when outages have interrupted their service.

115.  The permits and switching orders prepared and implemented by SOs require that they utilize their discretion and independent judgment. While there are OIs and other written documentation (although there are no SOPs or bulletins on the Transmission side) there are many situations that cause SOs to rely upon their experience and training to address issues not addressed by OIs.

116.  While Plaintiffs will argue that any discretion and independent judgment is restricted by their reliance upon these OIs and other written documentation, like the SOPs or bulletins, the DOL regulations recognize that the use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude the application of the administrative

24

exemption. Such manuals and procedures providing guidance in addressing difficult or novel circumstances and the use of such reference materials does not affect an employee's exempt status. The exemptions are not available however for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to inquiry or set of circumstances. 29 C.F.R. § 541.704.

117. The evidence establishes that the OIs are in fact highly technical and complex and can only be interpreted and applied by persons who have undertaken specialized training as is provided to SOs during initial and continuing training.

118. Other Courts considering employees working at public utilities and performing duties similar to those performed by the PPL SOs have found these employees to be exempt relying upon the administrative exemption. In *Grage v. Northern States Power Company – Minnesota*, 2015 WL 9465937 (8th Cir. 2015), the Court found that a power company employee was exempt from the overtime provisions of the FLSA under the administrative exemption. Of particular significance to the Court in reaching this conclusion was that plaintiff exercised significant independent judgment and discretion. In reaching this conclusion, the Court relied upon evidence showing that the employee (1) prioritized work assignments; (2) allocated work crews and resources between jobs; (3) reorganized projects in the midst of changing circumstances by considering different courses of actions and possible outcomes in implementing operating procedures; and (4) carried out assignments while participating in planning business objections, exercised a substantial amount of discretion and independent judgment.

119. In another decision, a district court concluded that job planners employed by a power company that was heavily regulated were not by reason of these regulations precluded from

25

exercising their own discretion and independent judgment. There, the process of generating repair work projects packages was neither wholly mechanical nor restricted to "merely applying knowledge" even when following these prescribed procedures. When there is no procedure that can be applied to a particular task, a planner at a power station must independently determine the nature of the repair task and prepare a repair plan. In those situations, planners used their own skills, experience, judgment and discretion in formulating a repair solution. Additionally, the planners exercised independent decision-making when choosing among various options to remedy a problem – for example, determining whether to replace or repair equipment. *Renfro v. Indiana Michigan Power Company*, 370 F.3d 512 (6th Cir. 2004).

120.   The Court in *Renfro* found that the planners' exercise of discretion and independent judgment involved "matters of significance" which related to the importance or consequences of the work being performed. 29 C.F.R. § 541202(a). The Court explained that both long term and daily planning is of "extreme importance" to a power company as how the employee performed her job affected the service provided to customers which was of great importance or consequence.

121.   Employees employed as work planners, lead planners, supply analysts, staff specialist and first line supervisor at a nuclear generating station were similarly found to exercise discretion and independent judgment with regard to matters of significance even in their highly regulated workplace which was "procedure driven, routine and strictly controlled" because while employees discretion may be channeled by the regulations that apply to the industry, that did not preclude them exercising independent discretion and judgment. *Kennedy v. Commonwealth Edison Co.* 410 F.3d 365 (7th Cir. 2005). The *Kennedy* Court explained that to find otherwise

26

would suggest that a tax lawyer does not exercise discretion or independent judgment just because the Internal Revenue Service contains a highly regimented set of rules.

122.  PPL SOs, not *unlike* the planners in *Kennedy,* are expected to create a job plan by the permits they prepare or switching orders that will remedy reported problems.  While the planners *in Kennedy* were remedying reported problems around the plant, the PPL SOs are remedying problems on the distribution and transmission lines and at the substations and the fact that used OI for guidance "does not transform them into automons".  *Id.*

123.  The PPL SOs, both Distribution and Transmission, are expected to make and do make decisions without the direct involvement or participation of supervisors.  These decisions involve matters of significance which will have important consequences relating not only to the safety of field crews and the public at large, but in addition, providing uninterrupted service to PPL customers and restoring that service in response to both unplanned and planned outages.

124.  In *Zelenika v. Commonwealth Edison Co.* 2012 WL 3005375 (N. D. Ill. 2012), the District Court considered several positions at a power generating station including dispatchers, Shift Managers and Arrangers.  While finding that there were material disputed facts at the summary judgment stage on the issue of the use of discretion and independent judgment, the Court stated that "it did not doubt that Shift Managers and Arrangers would fall within the administrative exemption." The Arrangers duties were described this way: Some problems with the electrical grid are fixed through scheduled maintenance. In these cases, ComEd employees known as "Arrangers" prepare a "switching routine," a step-by-step procedure to deenergize equipment needing repair and to redirect power in the interim. The Court described the Arrangers to be most similar to the work planners in *Kennedy* as the switching routines that they prepared were most like to how the work planners devised solutions within the nuclear plants.

27

These are the very same duties that are performed by System Operators responsible for preparing permits and switching routines that are performed by PPL field crew personnel.

125.  Plaintiffs are exempt employees within the administrative exemption of the FLSA and PMWA.  29 U.S.C. 213(a)(1); 43 Pa. Stat. 333.105(a)(5).

126.  The Complaint is dismissed with prejudice.

STEVENS & LEE, P.C.

By: /s/ Larry J. Rappoport, Esquire
       Larry J. Rappoport, Esquire
       Attorney ID 26922
       Lisa M. Scidurlo, Esquire
       Attorney ID 80487
       620 Freedom Business Center, Suite 200
       King of Prussia, PA  19406
       Telephone:   (610) 205-6039
       Facsimile:    (610) 371-7977
       Email:  ljr@stevenslee.com

*Attorneys for Defendant*

Dated:  March 15, 2016

03/15/2016 SL1 1406932v1 067014.00287

## CERTIFICATE OF SERVICE

I, Larry J. Rappoport, Esquire, hereby certify that a true and correct copy of the foregoing Defendant's Proposed Findings of Fact and Conclusions of Law, was filed electronically and made available for viewing via the Court's ECF system.  I further certify that the following party was served via FedEx Priority Overnight, addressed as follows:

Peter Winebrake, Esquire
R. Andrew Santillo, Esquire
Mark J. Gottesfeld, Esquire
WINEBRAKE & SANTILLO, LLC
715 Twining Road, Suite 211
Dresher, PA  19025

/s/  Larry J. Rappoport
Larry J. Rappoport, Esquire

Dated:  March 15, 2016