IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN GALDO,[1] et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 14-5831 |
| | : | |
| PPL ELECTRIC UTILITIES CORPORATION | : : | |

<u>MEMORANDUM</u>

**Juan R. Sánchez, J.**                                                                                             **August 26, 2016**

In this Fair Labor Standards Act (FLSA) and Pennsylvania Minimum Wage Act (PMWA) collective action, Plaintiffs William Clair, Jamie Connolly, John Doherty, Kevin Ehritz, Thomas Gurgick, Jr., George Knebel, Ricardo Maderas, Jr., Michael Murphy, Pamela Shinsky, Harold Spiess, Jr., Kenneth Steward, Gregory Tenley, and Stephaniejane Afalla (Villaneuva) bring suit against PPL Electric Utilities Corporation for failure to pay appropriate overtime compensation.[2] Their claims proceeded to a two-day, non-jury trial on February 9, 2016. Because the Court finds Plaintiffs' primary duty requires the exercise of discretion and independent judgment as to matters of significance, the Court concludes Plaintiffs are exempt from overtime compensation pursuant to the FLSA's and PMWA's administrative exemptions and will enter judgment in favor of PPL and against Plaintiffs. The Court makes the following findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACTS**

PPL is an electrical distribution and transmission company serving approximately 1.4 million customers in northeastern Pennsylvania. Trial Tr. (2/8/16), at 264-65. Plaintiffs are PPL

---

[1] Plaintiff John Galdo, who brought this action on behalf of himself and other similarly situated employees, sought and was granted voluntary dismissal of his claims on July 13, 2015.

[2] By Order of February 5, 2016, the Court granted summary judgment in favor of PPL as to the FLSA claim asserted by Clair, Ehritz, Spiees, Steward, and Tenley, only.

employees or former employees covered by the FLSA and PMWA; PPL is an employer covered by the same. Stipulation ¶¶ 1-2, ECF No. 60. When Plaintiffs work overtime, PPL pays compensation at a straight time rate or 1.2 times their regular rate of pay. *Id.* ¶¶ 3-5. Plaintiffs are or were System Operators (SOs) in PPL's Transmission or Distribution Department.[3] Trial Tr. (2/8/16), at 267. The two departments differ in the amounts of voltage handled. Transmission System Operators (TSOs) manage the transmission system: power lines from 69,000 volts up to and including 500,000 volts. Trial Tr. (2/9/16), at 76. Distribution System Operators (DSOs) manage the distribution system: the power lines handling electricity below 12,000 volts. Trial Tr. (2/8/16), at 19. No Plaintiff is a Senior SO. Stipulation ¶ 6, ECF No. 60. All SOs currently work in the Windsor Service Center, Trial Tr. (2/8/16), at 267, but previously SOs worked out of the Lehigh Service Center, *id.* at 131.

DSOs are divided into seven teams. Trial Tr. (2/8/16), at 268-70. Each team consists of a shift supervisor, a Senior SO, three to four DSOs, and two dispatchers. *Id.* at 268.[4] The teams rotate through three shifts on a 7-week rotation. *Id.* at 270. Several teams work the day shift, but only one team works the second and night shifts at a time. *Id.* at 270. On the weekend, only one team will work each 12-hour shift. In contrast, on weekdays, teams will work one eight-hour shift each day. *Id.* at 270.

The day-to-day work for a DSO is fairly similar. *Id.* at 21. At the beginning of each shift, each DSO reviews the checklist for his or her shift, which lists tasks to be accomplished during

---

[3] PPL's SO job description indicates a SO is, "under general direction, responsible for the more complex directed single and three-phrase switching and customer restoration efforts" and is to work "independently with minimal guidance using knowledge of the PPL Permit and Tag process, T&D Operating Instructions, and departmental guidelines." Ex. 5, at 1.

[4] Until approximately three years ago, no shift supervisors were on site, but were instead available to SOs via phone. Trial Tr. (2/8/16), at 130.

the shift and is created by senior SOs and supervisors. *See, e.g., id.* at 23-24, 71, 149, 271-72. Checklists provide continuity between the shifts. *Id.* at 271.

One of a DSO's primary responsibilities is monitoring the distribution system from the Windsor Service Center and addressing any problems that arise. *Id.* at 36, 67, 148. A DSO is equipped with various computer systems making this possible. *See, e.g.*, *id.* at 20, 71, 89, 121-122, 148, 175-76, 198, 200. Another primary responsibility is performing switching, which is the process of manipulating a device in the field—whether a voltage regulator, capacitor bank, or other piece of equipment—to turn it on or off. *Id.* at 19, 272-74. Switching is done when a device needs to be repaired or maintained, a new piece of equipment must be installed without service interruptions, or in the event a line is damaged, so electricity may be restored to customers. *Id.* at 275. While switching, DSOs will collaborate with field crew, such as linemen, troublemen, and substation repairmen. *Id.* at 36-39. Previously, switching was performed manually by field crews that would physically move a switch from one position to another, but SOs are now able to perform switching remotely from the Windsor Service Center utilizing PPL's Distribution Management System (DMS). *Id.* at 285, 288. DMS monitors the approximately 3,000 remote operator devices PPL has installed. *Id.* at 288.[5] The combination of these devices is PPL's so-called "smart grid."[6] A component of DMS is the Fault Isolation and System Restoration (FISR), which was introduced in August 2015. *Id.* at 290. FISR is able to perform several power-

---

[5] At time of trial, about 3,000 remote operator devices were in operation; about 800 new devices are being installed each year. *Id.* at 299.

[6] Each remote operator device has a fault indicator on it. *Id.* at 285. The fault indicator measures current: If there is a fault downstream of the indicator, the indicator will send a signal back indicating the fault. *See id.* Thus, using the fault indicators, a DSO can determine where the fault is in a circuit breaker, open upon the device in the proper location, and reclose the circuit breaker so customers upstream of the fault are restored to power. *Id.* The DSO can then fix the section of the line out of power and reenergize it. *Id.* at 285-86.

restoration actions on its own without SO guidance. *Id.* at 287. It is currently installed on 240 circuits and has operated twice as of trial. *Id.*[7] In certain circumstances, remote switching is still not possible and on yet other occasions, more switching is still necessary after remote switching has been performed, like when a switch breaks. *Id.* at 83. At those times, DSOs will perform manual switching to restore more customers to power. *Id.* at 291-92.[8]

Another primary responsibility of a DSO is preparing work permits for both planned and unplanned work. A work permit satisfies the OSHA requirement for a lockout/tagout system when working on electrical lines. *Id.* at 292. A permit designates "what blocking points need to have a red tag or a tag on it to say, you cannot operate this" and also designates which sections of line the SO is turning jurisdiction over to the lineman—the field worker. *Id.* at 292-93. For planned work, DSOs will first receive a request from a field worker asking, for instance, to take out a section of line or substation. The request goes to a Planner SO, who will review the job and may go out into the field to ensure she understands the details of the work.[9] *Id.* at 294. The Planner will then write the permit and send it for review by three DSOs. *Id.* at 295.

For unplanned, unscheduled emergency work—such as repairs to a downed wire—a DSO also completes a work permit indicating what exact switch moves need to take place, the clearing time when the work will be finished, the day and time the permit is issued, and who it is being issued by and to. *See* Ex. 14. In order to determine what work needs to be done, a DSO will first try to locate where the wire is. Trial Tr. (2/8/16), at 283. If the DSO lacks enough information to

---

[7] The remaining fifty or sixty outages occurring on those lines since FISR's installation were restored by DSOs. *Id.*

[8] In addition to the 3,000 remote operator devices, PPL has 4,000-5,000 manually operated devices, which must be switched by a field crew member. Trial Tr. (2/8/16), at 292.

[9] Planner SOs no longer perform general SO functions, but solely write permits. Certain SOs are chosen to rotate through the planning position. Trial Tr. (2/8/16), at 50.

make a decision to de-energize the line, the DSO will dispatch a field crew to go look at the wire. *Id.* Once the DSO completes the permit, it is issued to the lineman without peer review or direct review of the shift supervisor. *Id.* at 312-14.

DSOs who work on the day shift perform more planned work, such as switching. *Id.* at 271. In contrast, DSOs on the second and third shift spend more time reviewing paperwork and writing permits. *Id.* The second shift also ensures anything put into service during the day is properly documented and sent over to other relevant groups at PPL. *Id.* at 272.

DSOs are guided in their work by Standard Operating Procedures (SOPs). *Id.* at 168.[10] SOPs function as an "administrative directive." *Id.* at 164. For instance, a SOP might provide direction as to how to write a report or how to report issues to a supervisor to ensure information is reported consistently. Trial Tr. (2/9/16), at 36-37. The vast majority of SOPs are related to documentation. *Id.*

Both DSOs and TSOs are guided in their work by Operating Instructions (OIs). OIs provide instructions for how to perform certain tasks on a particular piece of equipment, site, or substation, Trial Tr. (2/8/16), at 24, 28, 164, and can number from a few pages long to up to "50, 60, 70 pages," *id.* at 28. Both OIs and SOPs are accessed electronically at each SOs' station. *Id.* at 27. Hundreds of OIs exist. *Id.* at 25, 92, 179. OIs vary in scope: for instance, while individual OIs exist for each substation, only one OI addresses all the distribution lines, of which there are thousands. *Id.* at 168. In contrast, OI 153, which is used by TSOs to direct the application of PPL's permit and tag procedures on the bulk power transmission system and prepare all related documents, merely provides definitions of tags. Trial Tr. (2/9/16), at 97. While SOs will

---

[10] TSOs do not rely upon SOPs. Trial Tr. (2/9/16), at 96.

reference OIs when writing permits or performing other routine tasks, OIs are seldomly used in emergencies, as outages "tend to be a bit simpler" than planned work. Trial Tr. (2/8/16), at 311.

Reading an OI requires a certain level of technical knowledge and familiarity. *Id.* at 145, 166.[11] DSOs gain this knowledge—and knowledge of how to perform their jobs generally—through both on-the-job and classroom training and mentorship. *See, e.g.*, *id.* at 48-49; Trial Tr. (2/9/16), at 6. As a part of training, DSOs are required to complete a checklist of tasks covering each aspect of a DSO's duties. Trial Tr. (2/9/16), at 4. At first, a DSO trainee will mostly observe their mentor perform the job, *id.* at 6, but as the trainee progresses, she will actually perform the actions, while the mentor provides step-by-step directions and suggestions, and then finally, she will do all the operations on her own, with the mentor observing to prevent critical errors, *id.* at 6-7. Trainees are also required to complete simulations that very closely mimic the actual job and progress in difficulty. *Id.* at 7-10. If a trainee does not successfully complete a simulation, she must repeat it after some coaching. *See id.* at 11.

SOs do not deviate from OIs or SOPs. Trial Tr. (2/8/16), at 25, 26, 29, 179, 182, 210. In fact, SOs are subject to discipline for not following OIs or SOPs. *Id.* at 29. Clair, a DSO, testified he once failed to follow an OI and was placed on a performance improvement plan and probation for a number of months. *Id.* at 135-37. Most Plaintiffs testified they had never experienced outages or an activity not covered by an OI, *see, e.g.*, *id.* at 28, 71, 85, 125, 141, 156. Tenley, a TSO, however, has experienced circumstances where an OI was inadequate. In such circumstances, he would utilize a procedure called a "stop timeout," where he would stop

---

[11] Murphy, a DSO, testified he did not believe the OIs were technical in nature, but clarified his wife could do only interpret the OIs "with proper [electric utility training]." *Id.* at 200.

working and consult with Senior SOs and managers to determine the next step. Tenley Tr. (2/3/16), at 15.[12]

The Transmission Department is structured somewhat differently than the Distribution Department. TSOs report to the operations planning manager, the operations manager, or the engineering reliability risk supervisor, rather than a shift supervisor. Trial Tr. (2/9/16), at 73. Like DSOs, however, TSOs work a "24/7" operation. *Id.* at 74. Each TSO works one of three 8-hour shifts Mondays through Fridays, and two 12-hour shifts over the weekend. *Id.* TSOs work without supervisors during overnight and weekend shifts. *Id.*[13]

Like DSOs, on a typical shift, incoming TSOs will review the previous shift and the permits and switch orders for the current shift. Tenley Tr. (2/3/16), at 7-8. TSOs must also complete a checklist during each shift. *Id.* at 8; Trial Tr. (2/8/16), at 90. TSOs will then execute permits and switch orders. Tenley Tr. (2/3/16), at 8. Occasionally, a TSO will deviate from a written permit because of differences in real time conditions. Trial Tr. (2/8/16), at 230. Like DSOs, TSOs are involved in writing permits to set forth the step-by-step process for de-energizing a line or piece of equipment. Tenley Tr. (2/3/16), at 71-72. TSOs also monitor the

---

[12] The stop timeout is a "human performance tool," a set of measures Plaintiffs utilize to minimize the effects of human error. Another human performance tool Plaintiffs use is called a three-pass check or three-part communication. Trial Tr. (2/8/16), at 177, 313.

[13] There are positions in the Transmission Department reserved for TSOs who work as Planners. Like their Distribution Department counterparts, Planners, who review work requests from field workers and permits for future work, *id.* at 74, are only involved with scheduled repairs and maintenance, processing around 3,000 jobs a year. Trial Tr. (2/8/16), at 221. Planners are also responsible for performing job studies ahead of scheduled work, to ensure the planned work meets PPL's reliability risk criteria. Trial Tr. (2/9/16), at 95. This requires producing an electrical model of a requested action or process to determine if any adverse consequences are associated with the work. *Id.* at 95-96. A permit written by a Planner is initially reviewed in the Planning Office, and then is peer reviewed at least three times by other TSOs to ensure the sequence of actions makes sense and is safe. Trial Tr. (2/8/16), at 224-28. Planners may write job permits a month in advance. *Id.* at 230.

Energy Management System (EMS), which generates alarms when an outage occurs. *Id.* at 72-73. When an outage occurs, the TSO will identify where the outage is and call for a troubleman or lineman to do switching to restore service. *Id.*; *see also* Trial Tr. (2/9/16), at 101-02. Because different lines have different numbers of switches, there are usually multiple solutions to a problem, requiring a TSO to use his training and experience in conjunction with the OIs to achieve the optimal solution. *Id.* at 76-77.

Just as with the distribution system, TSOs are able to address some outages remotely, while other situations require a "callout" to field crews. Trial Tr. (2/9/16), at 99-100. In a callout situation, the TSO is notified by an alarm on his EMS system. *Id.* at 102. The TSO will then communicate with a troubleman or a lineman to do switching to restore as many customers as possible. *Id.* at 101. He may also perform several job studies to evaluate whether additional voltages can be handled and whether switching would exceed thermal constraints. *Id.* at 103. The TSO will also write a permit to detail the switching being performed. *Id.* Thus, during an emergency situation, a TSO must evaluate what the paths are to restore customers, determine the best path, whether a particular path is within voltage and thermal guidelines, and when voltage can be transferred. *Id.* at 103-04.

TSOs communicate with employees of PJM, the regional transmission operator which oversees utilities in its footprint, numerous times over the course of the day. PJM issues manuals the TSOs are required to follow. Trial Tr. (2/9/16), at 127. PJM also provides directives in emergency situations from which TSOs cannot deviate, Trial Tr. (2/8/16), at 178-79, "unless completing the specified direction will violate safety, equipment, regulatory or statutory requirements, or would otherwise jeopardize the safe, stable operation of the Bulk Electric System." Ex. 2, at 7 (PPL's Emergency Load Procedures—Transmission Department); *see also*

Trial Tr. (2/8/16), at 94. PJM directives vary in content. For instance, when certain conditions are expected, PJM will issue alerts triggering an "emergency load control procedure." *Id.* at 106. In the event such an alert is issued, TSOs must take certain actions as specified by the relevant emergency load control procedure. Trial Tr. (2/9/16), at 107; *see, e.g.*, Ex. 2, at 62-64 (listing the procedures for the cold weather alert, hot weather alert, and low voltage alert). Generally, the procedures require the TSO to review scheduled and active work to determine if any can be deferred or cancelled, and to suspend any high risk testing of transmission equipment. *See* Ex. 2, at 62-64. A procedure may also specify other actions to be taken; however, generally the procedures are not step-by-step directions for what to do when a particular alert is issued. *See id.*; *see also* Trial Tr. (2/9/16), at 106-07. Instead, because a procedure indicates only the actions to be taken, the execution is left up to the TSO based on his training and experience and the applicable OIs. *See* Trial Tr. (2/8/16), at 194-97.

TSOs are also required to comply with all standards, including training standards, issued by the North American Electric Reliability Council (NERC), which oversees all utilities in the country. *Id.* at 94; Trial Tr. (2/9/16), at 81; Santarelli Dep. (8/11/15), at 20, 22. Outside of NERC training, TSOs also undergo PPL-directed training and PJM training. The PPL-directed TSO training is similar, if more complex, to the training DSOs undergo, and also includes several simulations. Trial Tr. (2/9/16), at 83-84. TSO trainees also must pass a PJM transmission certification test. *Id.* at 81-83.

Although guided by numerous OIs, SOPs, regulatory directives, and other policies and procedures, DSOs and TSOs make evaluative judgments whether performing switching, writing up permits, or addressing emergent circumstances. For instance, Plaintiff Clair, a DSO, testified when performing switching, he would have to evaluate how a circuit was fed, what needed to be

9

closed, and what needed to be opened so that customers would not be dropped. Trial Tr. (2/8/16), at 135. Plaintiff Knebel, another DSO, testified he would use his training and experience to assess, evaluate, and respond to unexpected conditions, such as outages caused by automobile accidents, animals, or storms. *Id.* at 84-86.

TSOs, similarly, make evaluative judgments. For instance, the TSOs on duty during the Berwick Load Shed Event had to determine the appropriate course of action when one of the three 69,000-volt lines at the Berwick Substation tripped unexpectedly. Trial Tr. (2/9/16), at 108. Because another one of the lines was already out of service for planned work, the entire substation was reduced to only one line. *Id.* The TSO on duty noticed a low voltage indicator, ran a job study to determine how much load would need to be shed to bring the voltage back to acceptable levels, and directed the DSO to drop the load appropriately. *Id.* at 109. A second example: at Juniata, a 500,000-volt to 230,000-volt substation, after reports of a fire, the TSO on duty took independent action by immediately dropping the 500,000-volt bus without supervisory input, which prevented additional damage to equipment and injuries to emergency responders. *Id.* at 110-11.

A TSO also used his or her authority to act independently to disrupt the Face Rock 697 Span, a transmission line between the Holtwood hydroelectric plan and Face Rock substation on a day Holtwood was testing two new units. *Id.* at 111. The TSO monitoring the system noticed an alarm indicating the two units were generating above the thermal ampacity of the transmission circuit and called PJM—without relying on any OIs or supervisor—to ask them to reduce the units. *Id.* at 112. Furthermore, without relying on supervisor approval, a TSO at Lock Haven permitted repairmen to proceed with repairs on a circuit breaker mechanism after running several job studies, which determined there would be no safety consequences. *Id.* at 114.

TSOs faced with a Department of Defense blimp escaped from Aberdeen, Maryland, also took independent action. *Id.* at 115. The blimp had broken its tether—the tail—and consequently floated across Pennsylvania, losing altitude and interrupting three 69,000-volt lines, two 230,000-volt lines, and one 500,000-volt line. *Id.* at 116. When the TSOs on duty first received notification of numerous outages, they had to determine the source of the service interruptions. *Id.* at 117. They then prioritized the repairs, first by contacting PJM and also by performing job studies. *Id.* at 118. The TSOs also worked with linemen and troublemen to restore the lines. *Id.* at 119. The situation was additionally complicated because at the time of the unplanned outage, PPL was performing planned work in a particular area, for which it had already transferred a group of customers *to* one of the substations the blimp then knocked out of service. After the TSOs restored as many customers as they could, one TSO took it upon himself to contact the permit holder—the party performing the planned repair work—and ask if they could restore the line, so the remaining customers would have power. *Id.* at 120. No OI covered the decisions made, and only one supervisor was involved at a high level. *Id.* at 121.

Finally, both DSOs and TSOs are officially authorized to take independent action—without the permission of any supervision or management—when actual system conditions require immediate operator action to preserve it. Ex. 16 (Aug. 10, 2012, Delegation of Authority letter from Vice President-Distribution Operations Daniel K. Bonenberger); Ex. 17 (Feb. 21, 2014, Delegation of Authority letter from Stephanie Raymond, Vice President of Transmission & Substations).

**DISCUSSION**

Both the FLSA and the PMWA entitle an employee who works more than 40 hours in a work week to overtime pay "at a rate not less than one and one-half times the regular rate at

which [she or] he is employed," 29 U.S.C. § 207, unless the employee falls within an exemption, *see* 29 U.S.C. § 213; *see also* 43 Pa. Stat. § 333.104(c) ("Employe[e]s shall be paid for overtime not less than one and one-half times the employe[e]'s regular rate . . . ."); *id.* § 333.105 (listing exemptions to the PMWA); *Baum v. Astrazeneca LP*, 372 F. App'x 246, 248 n.4 (3d Cir. 2010) (noting Pennsylvania courts have looked to federal law regarding the FLSA for guidance in applying the PMWA). Because the FLSA is a remedial statute, "exemptions to it are construed narrowly[,] i.e., against the employer." *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010); *see also Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 872 (3d Cir. 2015) (noting the employer bears the burden of proving "plainly and unmistakably" its employees are exempt).

PPL argues Plaintiffs are exempt from overtime pay under the FLSA and PMWA under the bona fide administrative exemption, *see* 29 U.S.C. § 213(a)(1); 43 Pa. Stat. § 333.105(a)(5), which cover any employee who is:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; *and*
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200 (emphasis added); *see also Smith*, 593 F.3d at 283 (noting Congress has empowered the Secretary of Labor to "define and delimit" the terms of the FLSA's exemptions by issuing regulations, which have controlling weight). An employer must prove an employee meets all three prongs of the administrative exemption to be entitled to judgment with one exception: Under the FLSA, if an employee is "high compensated" by being paid at least $100,000 annually, an employer need only prove the employee "customarily and regularly performs any one or more of the exempt duties or responsibilities of an . . . administrative . . .

employee." 29 C.F.R. § 541.601(a). No such exemption, however, exists under the PMWA. *See* 43 Pa. Stat. § 333.105.

The sole remaining issue for trial was whether PPL could prove, plainly and unmistakably, Plaintiffs' primary duty involves the exercise of discretion and independent judgment with respect to matters of significance.[14] *See* 29 C.F.R. § 541.202(a). Determination of an employee's primary duty requires consideration of "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* § 541.700(a). In assessing whether an employee's primary duty involves the exercise of discretion and independent judgment with respect to matters of significance, a court may consider, but is not limited to, the following factors:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree . . . ; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

---

[14] In its February 5, 2016, Memorandum Opinion, the Court concluded both TSOs and DSOs are compensated on a salary basis at a rate not less than $455 a week and Plaintiffs' primary duty is the performance of office or non-manual work directly related to the management or general business operations of PPL or PPL's customers. Because the Court determined the TSO Plaintiffs are highly-compensated employees, the Court dismissed their FLSA claims against PPL. Because no such exemption exists under the PMWA, however, and because the Court determined a genuine issue of material dispute existed regarding the level of discretion and independent judgment both TSO and DSO Plaintiffs exercise in performing their primary duties, the Court did not grant summary judgment in its entirety.

Exercising discretion and independent judgment requires "more than the use of skill in applying well-established techniques, procedures or specific standards used in manuals or other sources," *id.* § 541.202(e); however, "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under . . . the [FLSA]," *id.* § 541.704 (distinguishing exempt employees from those "who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances"). Likewise, while generally an employee must have the authority to make an independent choice free from immediate direction or supervision, the exercise of discretion and independent judgment "does not require that decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id.* § 541.202(c).

A job title alone is insufficient to establish the exempt status of an employee; rather, the employee's status "must be determined on the basis of whether the employee's . . . duties meet the requirements of the regulations." *Dooley v. CPR Restoration & Cleaning Servs. LLC*, 591 F. App'x 74, 76 (3d Cir. 2014) (quoting 29 C.F.R. § 541.2). A court must therefore focus on "the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, positions descriptions, and performance evaluations." *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004); *see also Estrada v. Maguire Ins. Agency, Inc.*, No. 12-604, 2014 WL 795996, at *6 (E.D. Pa. Feb. 24, 2014) (determining whether a plaintiff exercises sufficient discretion and independent judgment to qualify as exempt requires a "fact-specific analysis" reviewing "different job descriptions and responsibilities").

Upon considering the non-exhaustive list of ten factors set forth in 29 C.F.R. § 541.202(b) and the evidence in this case, the Court concludes PPL has demonstrated Plaintiffs' primary duty requires the exercise of discretion and independent judgment with respect to matters of significance.[15] No evidence was presented indicating Plaintiffs have the authority to

---

[15] Despite moving for and receiving certification of Plaintiffs as a collective class, at trial, Plaintiffs' counsel maintained PPL was required to demonstrate each individual Plaintiff satisfied the administrative exemption requirement of having the primary duty of exercising discretion and independent judgment with respect to matters of significance, *see, e.g.*, Trial Tr. (2/8/16), at 7, 252, and maintained some Plaintiffs could be exempt and others not, *see id.* at 253. At the close of the trial, defense counsel, noting five Plaintiffs had not testified in any manner, suggested those Plaintiffs should be stricken from the case. In response, Plaintiffs' counsel stated it was not his "intention" to proceed with representative testimony and "with a case this small, we would come forward with the individuals, and they would provide evidence of their individual experiences." Trial Tr. (2/9/16), at 150-51. Accordingly, he indicated Plaintiffs were "prepared for the ramifications" of certain Plaintiffs' failure to testify at trial. *Id.* He also suggested the Court could "rule that the testimony of . . . the witnesses for defendant [are] able to counteract the absent . . . plaintiffs here and . . . rule for their and rule against their claims." *Id.* at 152. After trial, Plaintiffs reiterated they "chose to not go forward with 'representative testimony.'" Pl.'s Proposed Findings of Fact & Conclusions of Law, ¶ 4. At no point have Plaintiffs moved for decertification of the collective class.

Whether Plaintiffs themselves choose to proceed via representative testimony or not, Plaintiffs cite no authority indicating the Court cannot utilize such testimony to find plaintiffs collectively exempt from the FLSA. *See Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) (noting the determination of whether a particular plaintiff falls into an exemption is not inherently an individualized inquiry, especially if there is a showing that plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria). In fact, courts have permitted defendants to argue an exemption applies to a group of plaintiffs collectively in other FLSA actions. *See, e.g.*, *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008) (indicating it was appropriate to collectively litigate an "affirmative executive-exemption defense" when the plaintiffs' evidence established the defendant uniformly exempted all store managers from overtime pay and its exemption decision did not turn on any individualized factors); *Walters v. Am. Coach Lines of Miami, Inc.*, No. 07-22000, 2009 WL 1708811, at *4 (S.D. Fla. June 17, 2009) (holding the defendant could utilize representative testimony to put forth its affirmative defense, the FLSA's Motor Carrier Exemption). *Cf. Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050, 07-4012, 270 F.R.D. 499, 508 & n.5 (N.D. Cal. 2010) (suggesting the utility of representative testimony to prove an exemption depends on the type of exemption advanced and suggesting the executive exemption could be litigated using such testimony because the plaintiffs maintained the entire class had little discretion and followed standardized company-wide directives); *Damassia v. Duane Read, Inc.*, 250 F.R.D. 152, 157 (S.D.N.Y. 2008) (permitting action under the New York Labor Law to proceed as a class because the question of

commit PPL in matters that have significant financial impact, negotiate and bind PPL on significant matters, formulate long- or short-term business objectives, investigate and resolve matters of significance on behalf of management, or represent PPL in handling complaints, arbitrating disputes, or resolving grievances.

The evidence, however, demonstrates Plaintiffs spend the majority of their work day interpreting and implementing management policies or operating practices by monitoring Defendant's electrical grid, coordinating planned work outages and repairs, and addressing emergent situations. Although SOs are constrained in their actions by PPL's extensive sets of OIs, SOPs, checklists, and other procedures, which they are not involved in formulating,[16] the evidence at trial indicates these materials are hardly akin paint-by-number kits foreclosing discretion and independent judgment.[17] Rather, Plaintiffs could only effectively utilize the high-level guidance provided by the OIs, SOPs, checklists, and other PPL procedures by deploying

---

whether a class member was exempt under the executive or administrative tests was common to all class members' claims for relief).

     Plaintiffs did not present any evidence at trial indicating each Plaintiff was differently situated such that collective litigation of Plaintiffs' status as exempt would be inappropriate. The Court further observes that at the summary judgment stage, Plaintiffs maintained decertification of the collective as inappropriate because the purported differences between Plaintiffs were "minimal at best and outweighed by the similarities among Plaintiffs." *See* Pl.'s Mot. for Summ. J. at 12. Because the Court agreed Plaintiffs had met their burden of showing they were similarly situated, it thereupon certified them as a class. It seems inequitable to the Court that Plaintiffs would then maintain they were so similarly situated as to necessarily constitute a class for collective action purposes, but now maintain PPL must prove the exemption as to each member of the collective.

[16] Until mid-2014, SOs were involved in revising or updating the OIs, but PPL discontinued that practice because of issues with maintaining consistency across all of the OIs. Trial Tr. (2/9/16), at 21. In mid-2014, PPL asked five SOs and three senior SOs to rewrite all the OIs over an eight-month period. *Id.* All SOs still maintain the primary "operating maps" by drawing new components onto the map and submitting those updates to a group of managers. *Id.* at 22. But they are no longer responsible for writing and updating the OIs. *See* Trial Tr. (2/8/16), at 12, 29, 72, 96, 164, 181.

[17] Moreover, as previously noted, TSOs are not even guided by SOPs.

their knowledge of the transmission and distribution systems, acquired both from training and on the job experience.[18] In other words, SOs go beyond applying well-established techniques, procedures, or standards using manuals, *see* 29 C.F.R. § 541.202(e), because the materials provided by PPL require specialized knowledge or skills to utilize, *see* Trial Tr. (2/8/16), at 200 (testimony of Plaintiff Murphy conceding even though he did not believe the OIs were technical in nature, his wife could only perform his job "with proper [electric utility training]"). *Compare Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 647-48 (6th Cir. 2013) (holding special investigators, who examined suspicious claims with the purpose of determining whether insurance fraud was present, exercised discretion and independent judgment, even though they were subject to guidelines, extensive quality control, and auditing standards, because they used judgment, experience, and knowledge to resolve competing versions of truth, and their judgment affected a matter of significance: whether the insurance company would pay out the claim); *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 580-81 (7th Cir. 2012) (holding pharmaceutical representatives exercised significant measure of discretion and independent judgment, despite regulatory constraints and the "precise wording and materials" provided by the company, because they utilized their own sales strategies and were sent into offices with minimal supervision to engage with prescribing physicians); *and In re Farmers Ins. Exchange, Claims Reps.' Overtime Pay Litig.*, 481 F.3d 1119, 1129-31 (9th Cir. 2006) (holding insurance claims adjusters exercised discretion and independent judgment when determining coverage,

---

[18] Nor are Plaintiffs' job duties so exceedingly regulated by industry standards that they cannot exercise discretion and independent judgment. *See Kennedy v. Commonw. Edison Co.*, 410 F.3d 365, 374 (7th Cir. 2005); *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 519 (6th Cir. 2004); *see also Viola v. Comprehensive Health Mgmt, Inc.*, 441 F. App'x 660, 664-65 (11th Cir. 2011) (holding a plaintiff who had to ensure her marketing plans complied with a myriad of complex federal regulations and had to submit her plans to supervisors before they were finalized was not disqualified from the administrative exemption).

recommending reserves, conducting investigations, negotiating settlements, advising insurer regarding fraud indicators, even though a supervisor was required to sign off when settlements exceeded pre-authorization amounts and the claims adjusters relied on computer software to estimate claim amounts), *with Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 364-65 (5th Cir. 2015) (holding marine superintendents at an oil inspection company exercised little or no discretion or independent judgment because the extensive checklists they followed did not permit them to evaluate alternative courses of action after considering various possibilities, but rather merely required them to determine whether an inspected item met applicable standards).

Further, because the OIs and PPL's other policies and procedures, contrary to Plaintiffs' assertions, provide general guidance, rather than set rules, utilizing these policies and procedures, requires a significant measure of human judgment in determining the appropriate actions.[19] For instance, although TSOs are bound to follow a cold weather alert issued by PJM, the alert itself only directs the TSO to "[r]eview schedule and active work requests to determine if maintenance or testing on any monitoring or control or transmission equipment can be deferred or canceled" and "[s]uspend any high-risk testing of transmission equipment." Ex. 2, at 62. The directive does not explain how to review the schedule and active work requests or how to suspend testing. Rather, the execution is left up to the SO. When writing permits, moreover, Plaintiffs must exercise judgment in determining what OIs are applicable and must perform job studies to

---

[19] The parties do not dispute SOs are subject to disciplinary consequences if they deviate from the OIs in ordinary situations, but these consequences merely underscore the importance and sensitivity of Plaintiffs' work in maintaining the integrity and safety of PPL's electrical grid, rather than indicate Plaintiffs cannot exercise discretion and independent judgment. *Cf. Schaefer-LaRose*, 679 F.3d at 581 (characterizing the thorough, substantive training provided by the pharmaceutical company to its representatives as indicating the company believed their representatives needed a solid understanding of "the message that they were delivering," rather than as mechanisms for constraining the representatives from exercising discretion and independent judgment).

determine the course of action to implement. Shawn Cappellano-Sarver, the manager of the Distribution Department, testified OIs "have a very broad perspective." Trial Tr. (2/8/16), at 300. Cappellano-Server, who previously worked in the navy and the nuclear power industry, contrasted PPL's OIs with those in his previous positions, which "in general, are step-by-step: Open this valve; close this; turn this pump on; when you get this indication, do this; do this; do this. Very detailed. OIs at PPL are nothing like that." *Id.* He admitted while an OI might give a step-by-step procedure on how to perform a specific action, it does not specify when that action is necessary or why. *See id.*

The evidence also demonstrates Plaintiffs carry out major assignments in conducting the operations of the business and their work affects business operations to a substantial degree. PPL is in the business of providing electricity to customers throughout northeastern Pennsylvania, and Plaintiffs' primary duty is to maintain the stability of the electric grid and restore customer service when necessary. For example, when emergencies arise, a SO may be called upon "to save the system from overloading components or a cascading effect," whereby voltage starts to collapse across the system. *Id.* at 105. As various incidents such as the Juanita substation fire to the Aberdeen blimp incident demonstrate, SOs regularly use their knowledge and training to address situations substantially affecting PPL's business of providing electricity to its customers. Finally, the evidence demonstrates Plaintiffs have the authority to deviate from established policies and procedures without prior approval in certain emergency circumstances and have used their judgment to take independent action without supervision.[20]

---

[20] Plaintiffs contend the Court should not make this finding, as the exemption analysis requires a review of Plaintiffs' actual day-to-day activities, rather than their hypothetical powers, and the evidence demonstrates either no Plaintiff ever saw or heard of the delegation letters, or the circumstances specified by those letters were so unusual that no Plaintiff ever experienced such circumstances during his or her employment. The Court finds these arguments unpersuasive,

19

**CONCLUSIONS OF LAW**

Because PPL has proven by a preponderance of the evidence that Plaintiffs William Clair, Jamie Connolly, John Doherty, Kevin Ehritz, Thomas Gurgick, Jr., George Knebel, Ricardo Maderas, Jr., Michael Murphy, Pamela Shinsky, Harold Spiess, Jr., Kenneth Steward, Gregory Tenley, and Stephaniejane Afalla (Villaneuva)'s primary duty involves the exercise discretion and independent judgment as to matters of significance, Plaintiffs are FLSA- and PMWA-exempt under the bona fide administrative exemption.

An appropriate judgment follows.

---

given Plaintiffs previously urged this Court to certify them similarly situated and have provided no authority as to why PPL's evidence as to the duties and actions of SOs, even those not involved in this lawsuit, cannot be extrapolated to these Plaintiffs, if DSOs and TSOs are, in general, similarly situated.